JAMES LEHAN *vs.* LEONARD R. DRAPER & others.

Norfolk. April 3, 1935. — April 30, 1935.

Present: RUGG, C.J., CROSBY, PIERCE, LUMMUS, & QUA, JJ.

*Stockbroker. Contract,* Construction, What constitutes, With stockbroker. *Agency,* Ratification.

Evidence, that a margin customer of a stockbroker, when told by the stockbroker that he had "a good profit on" a certain stock which he had bought and when asked whether he wished to sell it, instructed the stockbroker to sell it at a certain price which was higher than what he had paid for it, "or at a profit"; that the customer, to the knowledge of the stockbroker, was inexperienced in margin transactions and did not know that it was necessary for a seller to indicate that a selling order was "good until cancelled" if he wished it to be effective after the day it was given; that on the day the customer's selling order was given and on the following two days the stockbroker put in orders to sell the stock at various prices, but it was not sold; and that through mistake on his part the stockbroker did not make any further attempts to sell it on later days, warranted a finding that the selling order was meant by the customer and understood by the stockbroker to be an order to sell at the price specified by the customer or, in the discretion of the

stockbroker, at some lower price greater than the purchase price paid by the customer, and also to be an order effective until cancelled, not one effective only on the day it was given.

Findings, that a "customer's man" of a firm of stockbrokers made an agreement on behalf of the firm with a customer to indemnify him against loss resulting from the "customer's man's" failure to sell a certain stock upon the customer's order, and that such agreement was ratified by the firm even if it were not within the ostensible authority of the "customer's man," were warranted on evidence that shortly after the sale should have been effected, the "customer's man," upon inquiry about the matter by the customer, told him that the stock had not been sold through mistake, "but don't worry. We will see you through all right"; that about a year later the customer received from the firm a statement of his account which he was asked to approve; that he mailed the statement back to the firm, having written thereon to the effect that he thought it incorrect in that the stock was not sold and that he would "appreciate a square deal on this stock"; and that thereupon the "customer's man" called him on the telephone and said "not to worry about" the stock "because we will take care of that."

CONTRACT. Writ dated January 20, 1930.

In the Superior Court, the action was referred to an auditor, and afterwards was tried before *Morton, J.* Material findings by the auditor and other evidence are stated in the opinion. The judge ordered a verdict for the defendants. The plaintiff alleged exceptions.

*W. R. Bigelow,* for the plaintiff.

*S. L. Solomont,* (*M. E. Gallagher* with him,) for the defendants.

PIERCE, J. This is an action of contract in three counts: the first count is on an account annexed; the second count is upon an alleged agreement between the plaintiff and the defendants to indemnify the plaintiff against loss because of the defendants' failure to sell securities upon the plaintiff's order; and the third count is for the defendants' failure to sell securities upon the plaintiff's order. At the close of the evidence the judge ordered a verdict for the defendants, and the plaintiff excepted to that order.

Upon the evidence, including the auditor's report, the jury would be warranted in finding the following facts: In November, 1927, the plaintiff bought some stock through the defendants, on margin, which was subsequently sold at a profit, leaving a credit balance of $4,037.36 on July 31,

1928. In these transactions the plaintiff dealt with one MacSwain, a "customer's man" for the defendants. MacSwain was away from Boston during the summer of 1928 until September 10. While he was away customers were cared for by one Draper, also a "customer's man." Draper was away on his vacation from September 10 until September 26. In August, 1928, the plaintiff bought on margin one hundred shares of "Swift International" and on September 7, 1928, one hundred shares of "Remington Rand." On Friday, September 7, 1928, the plaintiff, on the recommendation of said Draper, and on his statement that the plaintiff had money enough to do it, bought on margin fifty shares of "Fox Film" at $107\frac{7}{8}$ or $5,406.25. This transaction was not entered on the books of the defendants until Monday, September 10, 1928. The plaintiff testified that, on Saturday, September 8, 1928, Draper called him at his place of business and said: "Fox Film had reached 114, and he said: 'Sell it.' He said: 'Sometimes they don't bring that . . . Would you sell at 113?'" and the plaintiff replied: "Yes, sell it at a profit." The auditor found that the conversation was in substance as follows: "(Draper). Fox Film is selling at over 114 and you have a good profit on it. Do you want to sell? (Plaintiff). Yes, if I can get a good profit on it, I will sell. (Draper). Will you sell at 114? (Plaintiff). Yes, sell at 114 or at a profit." The plaintiff testified that he lived in Stoughton, Massachusetts; that these transactions were the first margin transactions he had ever had; that prior to September 8, 1928, he had never given a written order to buy or sell to the defendants; that he had bought in the defendants' office and had sold by orders over the telephone; that his attention had never been brought to any form of distinction in the making of an order to buy or sell; that the phrase "Good until cancelled" had never been brought to his attention by the defendants or any of the customers' men; that the phrase "Sell at market" had never been brought to his attention in any way; and that he was not familiar with these phrases at all.

Upon the evidence previously given before him, the

auditor found respecting these phrases as follows: "Plaintiff's failure to direct an order 'good until cancelled' would, if he [the plaintiff] had been an experienced stock trader, have implied an order 'good for the day only,'" but the plaintiff "was not an experienced trader and Draper knew it." He further found that there was no evidence (see the later testimony of the plaintiff at the trial) that the plaintiff "was ignorant of the necessity of using the words 'good till cancelled' if he desired the order to stand longer than for that day; or if he was ignorant of it, that Draper was aware of his ignorance"; that "Plaintiff had purchased this stock the day before almost solely on Draper's recommendation, and my inference is that he [the plaintiff] now authorized its sale at a profit, but left the details to Draper's good judgment, both the exact price to be asked — 114 or more — and the time limit of the order." The auditor found that "At 11:05 o'clock on that Saturday morning, Draper put in a day order to sell at 114; but the stock did not sell. That night, Draper left town for a two weeks' vacation and left a note on MacSwain's desk which said that Lehan had purchased fifty shares of Fox Film; that he had a profit on it and would like to sell it"; that "On the following Monday, the market was higher and at about 2:30 P.M., MacSwain put in an order to sell at $117\frac{5}{8}$; the stock did not sell. On the following day, Tuesday, at about 1:15 P.M., MacSwain put in an order to sell at $117\frac{3}{8}$; again the stock failed to sell." MacSwain testified before the auditor and again at the trial in the Superior Court that these orders were expressly authorized by the plaintiff in telephone conversations between him and MacSwain. This testimony was contradicted by the plaintiff and discredited by the auditor, with the comment which follows: "If these telephone conversations took place, I find that defendant[s] . . . [are] not liable for . . . [their] failure to sell the stock. If there were no such conversations, it is in my opinion a question of law for the court whether the telephone conversation between the plaintiff and Draper on September 8 constituted such an order as to make the defendant[s] liable for . . .

[their] failure to sell the stock. It could have been sold at 114 or even a higher price on Monday or Tuesday if orders to sell had been placed early on either of those days."

After Tuesday the price of "Fox Film" fell and no further effort to sell was made either by MacSwain or by the plaintiff. About two weeks after September 8, the plaintiff noticed that the stock was changing and so went to the defendants' office, saw Draper and asked him "if he had sold the Fox Film." He said "yes" he supposed he had; he then went away for a little while and came back and said: "I will have Mr. MacSwain call you in the morning." The next day the plaintiff had a telephone call from MacSwain, who said: "we are very sorry but by mistake we didn't sell that Fox Film, but don't worry. We will see you through all right"; and he left it that way. To this communication the plaintiff replied: "if that is the way you feel, that is all right for me." In September, 1929, the plaintiff received from the defendants an auditor's report of his account with the defendants as of September 30, 1929. This statement of account the plaintiff was asked by the defendants to approve. On the back of this statement the plaintiff wrote: "I do not think your statement is correct, you sold 100 shares Rem. Rand which credit does not appear, also my order for sale for Fox Film when it was $114 was not executed. Would appreciate a square deal on this stock. Have made two visits to your office about Fox Film and have had no satisfactory results." After he had written the above the plaintiff mailed the statement to the defendants, and received a telephone call from MacSwain to the effect that "Remington" had been taken care of "and not to worry about Fox Film 'because we will take care of that.'" This conversation was admitted in evidence in the Superior Court when offered by the plaintiff, "except so far as . . . [the plaintiff claimed] that it created any obligation on the part of" the defendants. To the refusal of the judge to receive the evidence as affecting the obligation of the defendants the plaintiff excepted.

The defendants deny that they had failed to sell the plaintiff's stock upon his order, and that they had agreed to take

care of the plaintiff on it. The plaintiff received a second call for margin on January 4, 1930, and, not furnishing it, was sold out.

Considered in its aspect most favorable to the plaintiff's contentions, the evidence at the trial, including the auditor's report, would have warranted the jury in finding that the defendants, through their agent, Draper, knew that the order given was to sell the stock which the plaintiff had bought at $107\frac{7}{8}$ at $113 or $114 "or at a profit," and that the order was meant by the plaintiff and understood by the defendants to be an order to sell at $113 or $114 or, in the discretion of the defendants, at a price less than $113 or $114 provided it was sold at a profit, that is, above $107\frac{7}{8}$. The jury on all the evidence further would have been warranted in finding that the order was not given or received as applicable to Saturday morning only, but was to stand "till cancelled," and would have been warranted in making such an interpretation of the order by the evidence that the defendants offered the stock for sale in the market on the Monday and Tuesday following the order, and that they did not sell it later through mistake. On all the evidence the jury would have been warranted in finding that through Mac-Swain the defendants, because of their mistake, agreed with the plaintiff, "We will see you through all right," and that this agreement with MacSwain was ratified by the defendants even if it were not within MacSwain's ostensible authority. It is plain on the evidence that the jury would have been warranted in finding that the plaintiff was known to be inexperienced in stock margin purchases and sales, and that the defendants knew also that the plaintiff was ignorant of the necessity of using the words "good till cancelled" if he desired the order to stand longer than for Saturday morning and until the stock exchange closed at noon.

Without further consideration of the questions raised by the defendants and the plaintiff, particularly as to damages, it is sufficient to say that the case should have been submitted to the jury with comprehensive and adequate instructions.

*Exceptions sustained.*